## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DISCOVERY REAL ESTATE AND
DEVELOPMENT, LLC                                    CIVIL ACTION

VERSUS                                              NO. 22-605-JWD-SDJ

TOWN OF ST. FRANCISVILLE, ET AL.

## RULING AND ORDER

### I.    INTRODUCTION

This matter comes before the Court on two motions.  First, Plaintiff Discovery Real Estate and Development, LLC ("Discovery" or "Plaintiff") has filed the *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Motion for TRO*") (Doc. 3).  Then, in response to briefing schedules from this Court, (Docs. 16, 17), Defendants Town of St. Francisville (the "Town") and Robert "Bobee" Leake (the "Mayor") (collectively, "Defendants") have submitted three filings, two of which are now relevant: (1) *Defendants' Motion to Dismiss Plaintiff's Claim under the Fair Housing Act for Lack of Subject Matter Jurisdiction, Failure to State a Claim, and/or to Dismiss or Stay under Colorado River Abstention* ("*FHA MTD*") (Doc. 18), and (2) *Defendants' Memorandum in Opposition to [Motion for TRO]* ("*Defendants' Opposition*") (Doc. 20).[1]  Plaintiffs then filed (1) a *Reply Memorandum in Support of [Motion for TRO]* ("*Plaintiff's Reply*") (Doc. 23) and (2) *Memorandum in Opposition to [FHA MTD]* ("*Plaintiff's Opposition*") (Doc. 24).

---

[1] The other filing was *Defendants' Rule 12(b)(1) Motion to Dismiss Count II for Lack of Subject Matter Jurisdiction and Rule 12(b)(6) Motion to Dismiss* ("*Takings MTD*") (Doc. 19). In response, Plaintiff represented that this motion is not relevant to the matter currently before the Court. (*See* Doc. 25 at 3 ("Discovery submits that the Takings Clause claim is not pertinent to the Motion pending before the Court. . . .").)

A hearing was scheduled for October 6, 2022. (Doc. 14.)  However, on October 1, 2022, the Court issued a notice canceling that hearing for reasons stated therein. (Doc. 30.)

These motions concern the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"). Discovery wants to proceed with a development in the Town.  However, the Town implemented certain changes to its Commercial Zoning Ordinance ("CZO").  Discovery claims the Town did so in violation of the FHA, with a discriminatory intent and effect, all in an effort to block Discovery's development.   Plaintiff here seeks a temporary restraining order prohibiting Defendants from (1) enforcing the changes and (2) enacting any new changes to the CZO without prior approval from the Court.

Defendants respond with indignity, calling Discovery's allegations "baseless" and "inflammatory."  The Town and Mayor raise a host of legal defenses, many of which hinge on certain key facts.  Most relevant here, Defendants point to a Sewer Capacity Ordinance.  The law, which has not been challenged in this case, restricts developments of any kind until at least June of 2023.

The Court notes at the outset that the allegations raised by the operative complaint are serious.  If true, Defendants' conduct in this matter deserves condemnation.

Nevertheless, this Court, like all federal courts, is one of limited jurisdiction, and plaintiffs like Discovery must satisfy certain jurisdictional requirements before bringing a claim here.

In short, Discovery has not done so.  Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court finds that Plaintiff's claim under the FHA must be dismissed for lack of standing and ripeness.  That is to say, Discovery's alleged harm (its inability to proceed with the development) is not traceable to the challenged action, and, if even it were, Discovery's harm could not be redressed by the relief it seeks.  Further,

Discovery's claim is contingent upon future events (namely, developments with the Town's sewer system) that may not occur as anticipated, or indeed may not occur at all. At this time, Discovery's claim is simply too speculative to proceed.

Accordingly, the Court will grant in part the *FHA MTD* and dismiss Plaintiff's FHA claim without prejudice. This holding pretermits any need to explore the numerous other issues raised in the *FHA MTD*.

For similar reasons, even if the Court found that there was subject matter jurisdiction, the *Motion for TRO* would be denied on an additional ground. More specifically, given the moratorium on developments in the Town instituted by the Sewer Capacity Ordinance (a law which remains in effect until June 2023 and which has not even been challenged in this case), Discovery has not shown that the harm suffered between the time it filed suit and the time of the ultimate decision in this case would seriously prejudice Discovery's opportunity for full recovery. Thus, Plaintiff has failed to make a clear showing of a substantial threat of imminent irreparable harm justifying the extraordinary relief of a temporary restraining order. On this alternative ground, the *Motion for TRO* would be denied.

## II.    RELEVANT FACTUAL BACKGROUND

### A.  The West Feliciana Parish Comprehensive Plan

On December 2, 2008, the West Feliciana Planning and Zoning Commission adopted a comprehensive plan (the "Plan") to guide future development in West Feliciana Parish (the "Parish"). (*V. Compl.* ¶ 5, Doc. 1; *V. Compl.* Ex. A, Doc. 1-2.) One of the "Guiding Principles," or the "core values" of the Plan, "is a 'livable community' with an emphasis on 'mixed-use sustainable development with a focus on providing attractive and safe neighborhoods . . . [and to] [p]romote a wider range of housing options.' " (*V. Compl.* ¶ 6, Doc. 1; *V. Compl.* Ex. A, Doc. 1-2

at 5.)  The Plan also lists as a goal to "[p]rovide for a wider range of housing options than currently exists in the parish—both in style and size, emphasizing the need for quality workforce hous[ing]," and the Plan elaborates:

> Based on the population and job forecasts used in the scenario-building process, the parish will have a need for new rental housing priced for low- and very low- income as well as for rentals for higher income households. For ownership households, the Parish will need to produce a similar supply of housing across income groups. The mix of housing products will need to vary along the income spectrum. In addition to single-family detached housing, multifamily units, townhomes, and cottage-style housing on small lots will serve lower income residents, seniors, and young families.

(*V. Compl.* Ex. A, Doc. 1-2 at 61 (emphasis in original).)  The Plan also lists the following Policy:

> **Use zoning to create a range of housing types that meet the needs of different segments of the population.** An important recommendation for the parish includes ensuring that mixed-use is allowed along appropriate arterials and commercial corridors. Additionally, the parish could create more compact development types that meet the needs of seniors, young professionals, and growing families.

(*Id.* at 63 (emphasis in original).)

On January 8, 2013, the Town enacted Ordinance 2013-1, which adopted a comprehensive zoning ordinance (the "CZO"). (*V. Compl.* ¶ 9, Doc. 1.)  The CZO was revised on March 25, 2014 (Ordinance 2014-1) and again on November 10, 2015 (Ordinance 2015-6). (*Id.*)  The CZO states, "These zoning regulations . . .  have been prepared for the Town of St. Francisville, Louisiana to safeguard the health, property and public welfare by controlling the design, location, use or occupancy of all buildings and structures through the regulated and orderly development of land and land uses within this jurisdiction." (*V. Compl.* Ex. B, Doc. 1-3 at 9.)

According to the *Verified Complaint*, the latest revision of the CZO happened on February 8, 2022. (*V. Compl.* ¶ 11, Doc. 1.) This revision "resulted in major changes to the CZO use districts

4

(Ordinance 2022-1) (the '2022 Changes')." (*Id.*) "The Town proposed further changes to the CZO in July 2022 that, if enacted, will result in further major modifications to the CZO." (*Id.*) Before these changes, the CZO was largely unaltered since its enactment in 2013. (*Id.* ¶ 12.)

Under § 2.2 of the CZO, "a multi-family dwelling" is defined as "[a] building or portion thereof designed for occupancy by three (3) or more families living independently in which they may or may not share common entrances and/or other spaces." (*V. Compl.* Ex. B, Doc. 1-3 at 18.) Section 3.4(A) of the CZO provides for certain use districts as follows:

- Residential Large Lot ("RLL"),

- Single-Family Residential ("RS-1"),

- Medium-Density Single-Family Residential ("RS-2"),

- Multiple-Family Residential ("RM-1"),

- Business Mixed Use ("BMX"),

- Commercial Town Center ("CTC"),

- Commercial Highway ("CH"),

- Light Industrial ("LI"),

- Institutional ("IS"), and

- Planned Unit Development ("PUD").

(*Id.* at 34.)

The "purpose and intent" of RM-1 Multiple-Family Residential was "to provide opportunities for low- to moderate-density residential neighborhoods with buildings on individual lots or for more than one (1) building on one (1) lot." (*Id.* § 3.8(A), *V. Compl.* Ex. B, Doc. 1-3 at 38.) "The RM-1 district shall accommodate single-family residences attached dwellings that have

common walls, including townhouses; congregate and other cluster developments, as well as multi-family structures ranging from duplexes to apartment buildings." (*Id.*)

Before the 2022 Changes, the CZO stated that all "permitted uses of RM-1 shall apply" in CH (Commercial Highway). (*Id.* § 3.11(B), *V. Compl.* Ex. B, Doc. 1-3 at 45; *see id.* § 3.9, *V. Compl.* Ex. B, Doc 1-3 at 43 (stating same for BMX (Business Mixed Use)).)

### B. Events Leading to the 2020 Changes While Mayor D'Aquilla Was In Office

#### 1. Discovery's Plans and Activity for the Development

Scott Sanchez is a member of Discovery. (*V. Compl.* ¶ 17, Doc. 1.) He served on the West Feliciana Economic Board of Directors (the "Board") and the St. Francisville Area Foundation (the "Foundation"). Plaintiff alleges that, through his experience with the Board and Foundation, Sanchez "learned that the Parish had a need for various housing types." (*Id.*) The Foundation invested resources to promote the development of new housing, but that investment had not led to any new housing developments to date. (*Id.*)

As a result, "Discovery decided to evaluate various housing development options for the Parish." (*Id.* ¶ 18.) In doing so, Discovery identified a 29.857-acre tract of undeveloped land that offered various zoning to support the development of various types of housing (the "Property"). (*Id.* ¶ 19.) "Portions of the Property were zoned RS-2, RM-1, and CH." (*Id.*) "The Property has frontage on Commerce Street, Burnett Road, and U.S. Highway 61, which is a four-lane highway." (*Id.*)

On March 29, 2018, Discovery bought the Property, "which is centrally located in the Town." (*Id.* ¶ 20.) Thereafter, Discovery retained Urban Design Associates ("Urban") to "conduct extensive interviews with key stakeholders in the Parish and Town to develop a master plan for the Property." (*Id.* ¶ 21.) Following these meetings, in August 2018, "Urban issued an overall

concept plan for developing the Property[.]" (*Id.* ¶ 22.) After this, "Discovery hired architects, civil engineers, traffic and drainage engineers, financial advisors, property appraisers, environmental experts, cultural resources experts, retail experts, and multifamily development experts to begin developing the Property." (*Id.* ¶ 23.)  Plaintiff alleges that, "Upon information and belief, Discovery's plans for the Property were the first and only housing development proposed in the Town since the enactment of the 2013 CZO." (*Id.* ¶ 24.)

Discovery decided to develop the Property in several phases and subdivide the Property to do so. (*Id.* ¶ 25.)  "In the first phase, Discovery developed a 50-lot development featuring single-family homes, cottage homes, and town homes known as the Reserve at Parker District (the 'Reserve')." (*Id.*)

In the second, Discovery meant to develop a roughly 13-acre portion into a multifamily development supporting commercial space, which would be called the Parker District—St. Francisville (the "Development").  (*Id.* ¶ 26.)

On December 3, 2019, AEI Consultants sent a letter to the Town about an environmental assessment it was conducting on behalf of Discovery. (Defs. Ex. B, Doc. 20-3.)  In the letter, AEI states that "[t]he subject property will consist of seven (7) apartment buildings housing a total of 155 apartments units." (*Id.* at 1.)

On December 16, 2019, an architect issued a set of preliminary architectural plans (the "Drawings") for the Development. (*V. Compl.* ¶ 27, Doc. 1.)  In the Drawings, "the Development will offer one, two, and three-bedroom floor plans and commercial space.  The Drawings also consider the needs of those with disabilities by making the Development handicap accessible." (*Id.* ¶ 28.)

About 75% of the Development is zoned as CH, and the rest is zoned as RM-1. (*Id.* ¶ 29.) Consequently, the Property was properly zoned for the Development before the 2022 Changes. (*Id.*)  As shown below, Defendants dispute this last point.

Additionally, "Discovery intended to use financing resources for the Development available through the U.S. Department of Housing and Urban Development's 221(D)(4) program. This required Discovery to pay fees that are nonrefundable." (*Id.* ¶ 30.)

When Discovery began to plan for the Reserve and the Development, "key stakeholders from the Town, including the long-time Town mayor Billy D'Aquilla . . . and the Board of Alderman supported Discovery's intentions for the Property." (*Id.* ¶ 31.)  Given the zoning and support of the Town stakeholders, Discovery started to raise capital for the Reserve and the Development. (*Id.* ¶ 32.)  To obtain the necessary capital, Discovery and its members "disposed of other income-producing properties in the Baton Roue metropolitan area." (*Id.* ¶ 32.)

### 2. The First Sewer Capacity Ordinance

On July 28, 2020, the Town adopted Ordinance 2020-4 (the "First Sewer Capacity Ordinance"). (Defs. Ex. C, Doc. 18-5.)  This ordinance states that it was enacted in part because the Town's "sewerage and sewer treatment facilities (the 'Sewer System') suffer[ed] generally due to a lack of capacity, and specifically from the repeated flooding of the Mississippi River." (*Id.*) That lack of capacity and flooding "pose[d] a threat to the health, safety, and general welfare of the Town." (*Id.*)  The Town further reasoned: (1) that it was trying to "improve the Sewer System and alleviate the threats;" (2) that separate capacity and water services to new customers had to be determined before the approval of any major subdivision; and (3) that, "because of the issues [the Town] face[d] with the Sewer System, [the Town] [was] in the process of reviewing its [CZO] generally, and its subdivision regulations specifically." (*Id.*) The Sewer Capacity Ordinance then

said that the Town wanted "any major subdivisions [to] comply with the [CZO] and subdivision regulations" after the "review and subsequent actions by the Board of Alderman, if any[.]" (*Id.*) Finally, the "Town desire[d] time necessary to adopt such legislation prior to new subdivisions being proposed and approved." (*Id.*)

For all these reasons, the Town "established a moratorium which prohibit[ed] the issuance of permits, including but not limited to, building permits, occupancy permits, sewer and/or water connects and any other permit to develop or improve any lots which have been created by the subdivision and/or re-subdivision of lands which creates more than four lots." (*Id.*) This ordinance was to remain in effect for a year. (*Id.*) The Sewer Capacity Ordinance was signed by Mayor D'Aquilla and the Town Clerk. (*Id.*)

### *3. The July 31, 2020, Preliminary Staff Report and Sanchez' Response*

Defendants submit a July 31, 2020, Preliminary Staff Report provided in connection with the Project. (Defs. Ex. H, Doc. 18-10.) The Report concluded, "The proposed site plan generally meets the requirements of the Town['s] . . . [CZO]." (*Id.* at 10.) The "Staff recommend[ed] approval with conditions." (*Id.*) Specifically, the report stated, (1) "Applicant will need to submit elevation drawings for buildings for design review and to verify building height of 35 ft.," and (2) "Unless a waiver is approved, only 114 MF units are permitted under the CZO." (*Id.*)

In August 2020, Sanchez exchanged emails with Laurie Walsh of the Town. (Defs. Ex. I, Doc. 20-10.) In the correspondence, Walsh attempted to explain the Town's calculation of 114.9 units per acre. (*Id.* at 2.) Sanchez said he "completely disagree[d] with [the Town's] logic and their definition" and said that he wanted to summarize his arguments on the issue. (*Id.*) According to Sanchez, the "lower RS2 zoning would allow 240 units," and he said Discovery was "currently planning on a very high quality, highly executed, 155 apartments." (*Id.* at 1)

9

### C. Events Leading to the 2022 Changes After the Mayor Succeeds D'Aquilla

#### 1.The Mayor Succeeded D'Aquilla

In fall 2020, the current Mayor (and Defendant) Robert "Bobee" Leake was elected. (*V. Compl.* ¶ 33, Doc. 1.) Thereafter, "community support for the Development suddenly changed." (*Id.* ¶ 34.)

#### 2. More Sewage-Related Ordinances

On January 26, 2021, Ordinance 2021-1 was enacted which levied a one-half percent sales and use tax dedicated to the "constructing, acquiring, extending, expanding, improving, maintaining, operating, and decommissioning sewage facilities (including but not being limited to sewerage treatment facilities) serving the Town, and acquiring immovable property, servitudes, and equipment related thereto[.]" (Defs. Ex. D, Doc. 18-6 at 3.)

On June 8, 2021, the Town enacted Ordinance 2021-3 (the "Second Sewer Capacity Ordinance"). (Defs. Ex. E, Doc. 18-7.) As to the reasons for the ordinance, the Town again cited the lack of capacity for the Sewer System, the river's repeated flooding, and concern for the "health, safety, and general welfare of the Town[.]" (*Id.* at 1.) Additionally, "a lack of adequate drainage, and utility and transportation infrastructure within the Town pose[d] a threat to the health, safety, and general welfare of the Town[.]" (*Id.*) The Town stated it was trying "(1) to upgrade and improve the Sewer System, and (2) study and alleviate the threats caused by a lack of adequate drainage and utility and transportation infrastructure." (*Id.*) The ordinance also cited the recently passed tax. (*Id.*) The Second Sewer Capacity Ordinance then said that "the capacity of Sewer and water services to customers, and the impact new developments have on the Town's drainage, utility and transportation infrastructure, must be determined prior to the approval of any major subdivisions and multi-unit residential structures incorporating more than four (4) individual

units total, per site." (*Id.*)  The Town then reiterated that, "because of the issues it faces with the Sewer System specifically, and with new development generally, [the Town was] in the process of reviewing its [CZO] and Subdivision Regulations, and the development standards contained therein." (*Id.*)  Further, the Town wanted "(a) major subdivisions and (b) multi-unit residential development incorporating more than four (4) individual units total, per site, [to] comply with the [CZO] and the development standards contained therein following the review and subsequent actions by the Town's Planning and Zoning Commission and Board of Alderman." (*Id.*)  The Town said again that it "desire[d] the time necessary to adopt such legislation prior to new subdivision and/or multi-unit residential structures being proposed and approved." (*Id.*)

For these reasons, the Town amended the moratorium instituted by Ordinance 2020-4 as follows:

> THEREFORE, LET IT BE ORDAINED that the moratorium established by Ordinance 2020-4 is hereby amended and otherwise extended to prohibit the acceptance of applications, and the issuance of permits, including but not limited to, building permits, occupancy permits, sewer and/or water connects and any other permits to develop or improve any lots which (a) have been created by the subdivision and/or re-subdivision of lands which creates more than four (4) lots or is a major subdivision; and/or (b) multi-unit residential development incorporating more than four (4) individual units total, per site.

(*Id.*)  The Second Sewage Capacity Ordinance was to remain in effect for another year.

Thus, as Plaintiff avers, "the Town extended and amended Ordinance 2021-3 related to the moratorium ('Moratorium) on new developments of any 'major subdivision' and new multi-unit residential structures." (*V. Compl.* ¶ 35, Doc. 1.) The earlier iteration of the Moratorium did not have multifamily developments. (*Id.* ¶ 36.)

Plaintiff claims he did not know about this change. (*Id.* ¶ 35.)  Plaintiff further alleges, "Upon information and belief, the Moratorium was instituted for the purpose of stopping the

Development, the only such known planned project, while more permanent regulations could be put in place to halt multifamily developments." (*Id.* ¶ 36.)

### *3. The July 22, 2021, Meeting between Discovery and the Town Officials*

On July 22, 2021, the Mayor, Town Manager Laurie Walsh, and Town Attorney Ben Klein met with representatives of Discovery about the Moratorium and Development. (*Id.* ¶ 37.) Defendants note in argument that this meeting took place "*after* the Sewer Capacity Ordinance was amended and extended by Ordinance 2021-3 *and after* Discovery was repeatedly told that its efforts to construct 155 units on the Property did not comply with the density limitations under the prior CZO that only permitted 114 units on the Property[.]" (Doc. 20 at 5 (emphasis in original).)

A recording of that meeting is in evidence. (*V. Compl.* Ex. I, Doc. 1-10.) Both sides highlight different parts of that meeting.

On the one hand, Plaintiff focuses on the Mayor's "strong prejudice against any development of multifamily housing[;]" his stating that he did not " 'know if that's the direction they want with the density with the apartments[;]' " his "mention[ing] having conversations about having 'more apartments in Town and what that brings . . .' " and his "ask[ing], 'is it going to attract the people we want in St. Francisville[;]' " his stating that "people have 'seen the [low-income] apartments adjacent [to the Property]. They've seen the other apartments,' " with those other apartments being a reference to the Audubon Apartments, which were adjacent to the Property, which predominately had Black tenants, and which were described online as being the " '[t]rue definition of "The Hood[;]" ' ' " and the Mayor suggesting that the Town wants the Development to be more like the Reserve. (*V. Compl.* ¶¶ 38–46, Doc. 1.) Discovery maintains that each of the above statements constitute "camouflaged racial expressions" that reflect discriminatory intent on the part of the Town. (*See* Doc. 3-1 at 12–13.)

12

Defendants, on the other hand, focus on the fact that Discovery "repeatedly stated that its proposed apartment development [was] 'high-end,' and 'luxury,' " (Doc. 20 at 5 (citations omitted).)  Defendants also note that Sanchez indicated that the Development would not be for low-income individuals. (*Id.* at 5–6.)  Defendants state, "Mr. Sanchez then explained that the 'long long long term' plan is for Discovery to 'acquire' the adjacent Section 8 housing to 'make it right' and 'make it a little better' but 'not integrate it but integrate it, you know what I mean.' " (*Id.* at 6 (emphasis omitted).)    Defendants call Plaintiff's accusations of racism "baseless" and "inflammatory." (*Id.* at 2.)

The Court summarizes the parties' positions merely for the sake of completeness.  Given the grounds for the instant ruling, the Court ultimately need not at this time resolve the factual disputes highlighted by the parties.

### 4. The State Court Lawsuit

On August 11, 2021 (two weeks after the recorded meeting between the Mayor and Discovery), Discovery filed a lawsuit in state court challenging the Moratorium as failing to provide interested parties a reasonable opportunity to be heard. (Defs. Ex. J, Doc. 20-11 at 3.) Discovery specifically attacked the failure to provide adequate published notices. (*Id.*)  Discovery further said that the Town "acted arbitrarily or without cause in passing the Ordinance." (*Id.* at 4.) Discovery sought injunctive relief and damages. (*Id.*)

On October 14, 2021, the state court denied Discovery's request for a TRO, finding Ordinance 2021-3 was not a zoning ordinance and that the Town was not required to comply with the statutes allegedly violated. (Defs. Ex. K, Doc. 20-12.)

### D.  The 2022 Changes to the CZO

On February 8, 2022, the Town passed the changes to the CZO, and Plaintiff alleges they did so to prevent the Development from happening. (*V. Compl.* ¶ 49, Doc. 1.)  Specifically, the 2022 Changes "prevent the construction of residential structures in CH," even though this was allowed before the changes, and even though this eliminated the possibility of the Development from happening (*Id.* ¶¶ 49, 52.)

Before the 2022 Changes, the Town had several public meetings about amendments. (*Id.* ¶ 50.)  According to the operative complaint:

> One citizen who spoke in favor of the changes testified that "people" wanted to move to Town to "feel safe," and that apartments would "disrupt that feeling." Others discussed how the Town would turn into Zachary or Denham Springs—two municipalities that have become more diverse over the past two decades.
>
> . . . At the same public hearings, Discovery opposed the modifications to the CZO because the 2022 Changes would eliminate the possibility for the Development to move forward. Mr. Sanchez and counsel for Discovery spoke against the 2022 Changes and identified the harm that would result not only to Discovery but also to the larger community.

(*Id.* ¶¶ 50–51.)

Further, Plaintiff claims that the Mayor's statements on July 22, 2021, indicate that "one of the goals of the 2022 Changes was to foreclose development or continued planning of the Development." (*Id.* ¶ 53.)  "Based on a review of the official zoning map of the Town, multifamily dwellings (i.e., apartment complexes) are significantly restricted to certain portions of the Town and largely [] [are] prohibited along U.S. Highway 61, the federally funded four-lane highway that cuts through the Town." (*Id.* ¶ 54; *see also V. Compl.* Ex. H, Doc. 1-9.)  Further, after the 2022 Changes, only two buildings in the Development would be located in RM-1; the rest would be in CH, which could not be developed as a multi-family community. (*V. Compl.* ¶ 55, Doc. 1.)  "The

2022 Changes also expanded approved uses in the Town's historic district, including increasing permissible density and building height, which is arbitrary in light of the severe restrictions placed on areas outside of the historic district." (*Id.* ¶ 56.)

Defendants, on the other hand, argue for the neutrality of the 2022 Changes. Defendants highlight that multi-family dwellings are permitted, though no longer on a commercial highway. (*See* Defs. Ex. L, Doc. 20-13 at 7.) Further, the 2020 Changes have several modifications that have nothing to do with Discovery, including amendments to the definitions of bar, brewery, distillery, restaurants (fast food, full-service, and specialty), and social club or lodge. (*Id.* at 1–3.) Lastly, Defendants maintain that the 2022 Changes reflect a shift away from "cumulative zoning" to "noncumulative zoning," (Doc. 20 at 8 (citing Defs. Ex. L, Doc. 20-13 at 4–9)), and Defendants further rely upon a Judge Posner case which highlights the legitimacy of such a transition, (*id.* at 20 (quoting *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 371–72 (7th Cir. 2010) (Posner, J.))).[2] Again, for purposes of the instant motions, the Court need not resolve this factual dispute at this time.

---

[2] Judge Posner specifically wrote:

> So let us consider those criteria, noting by way of background that originally zoning was "cumulative"—that is, "higher uses," such as residential land uses, were permitted in districts in which "lower uses," such as manufacturing, were permitted, though the "lower uses" were excluded from districts zoned for the higher ones. Cumulative zoning soon gave way to noncumulative (or "exclusive") zoning, in which specified land uses were confined to specified districts and thus could be and often were separated. See, e.g., *State ex rel. Berndt v. Iten,* 259 Minn. 77, 106 N.W.2d 366, 368–69 (1960); *McDonough v. Apton,* 48 A.D.2d 194, 368 N.Y.S.2d 603, 608–09 (N.Y. App. Div. 1975); *Grubel v. MacLaughlin,* 286 F. Supp. 24, 28–29 (D. Vi. 1968); Daniel R. Mandelker, *Land Use Law* § 5.43 (5th ed.2003). As explained in *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove,* 16 Ill.2d 183, 157 N.E.2d 33, 36 (1959), "the dangers of heavy traffic are greater in mixed residential-industrial or residential-commercial districts than in districts devoted to just one purpose. Industrial and commercial districts are not good places to bring up families from a health standpoint; and the presence of children in and about industrial and commercial districts leads to a demand for school, park and play-ground facilities in an area where there is either no land available or the land available is ill-suited to such

### E.  The Sewer Bond Financing Ordinance and Third Sewer Capacity Ordinance

On May 2, 2022, the Town enacted Ordinance 2022-4 (the "Sewage Bond Financing Ordinance"). (Defs. Ex. F, Doc. 18-8.)  The document authorized the Town to proceed through the Louisiana Local Government Environmental Facilities and Community Development Authority ("Authority") with the issuance of a revenue bond, not to exceed $5.25 million, to construct, acquire, extend, expand, improve, maintain, operate, and decommission sewerage facilities (including but not limited to sewerage treatment facilities) serving the Town and to acquire immovable property, servitudes, and equipment related thereto. (*Id.*)

On June 7, 2022, the Town issued Ordinance 2022-7 (the "Third Sewer Capacity Ordinance"). (Defs. Ex. G, Doc. 18-9.)  This ordinance is substantially similar to the Second Sewer Capacity Ordinance and expresses the continuing need for the law. (*Id.*)  The ordinance again noted, "the Town, because of issues it faces with the Sewer System specifically, and with new development generally, is in the process of reviewing its [CZO] and Subdivision Regulations, and the development standard contained therein."  (*Id.*) The Third Sewer Capacity Ordinance then extends the Moratorium for another year:

> **THEREFORE, LET IT BE ORDAINED** that the moratorium established by Ordinance 2020-4, and amended and extended by Ordinance 2021-3, is hereby extended to prohibit the acceptance of

> uses. In short, whether industry and commerce are excluded from the residential areas, or residences from industrial and commercial areas, it is not unreasonable for a legislative body to assume that separation of the areas would tend in the long run to insure a better and a more economical use of municipal services, such as schools, providing police protection, preventing and fighting fires, and better use of street facilities. The general welfare of the public may be enhanced if industry and commerce are provided with a favorable climate. The sale of a few lots at important points in a district may make industrial or commercial expansion impossible or prohibitively expensive. To protect the residents in the district, traffic may be slowed down unduly and thus detract from the efficiency of production and trade. In final analysis, it seems clear that industry and commerce are also necessary and desirable and that a proper environment for them will promote the general welfare of the public."

*River of Life Kingdom Ministries*, 611 F.3d at 371–72.

> applications, and the issuance of permits, including but not limited to, building permits, occupancy permits, sewer and/or water connects and any other permits to develop or improve any lots which (a) have been created by the subdivision and/or re-subdivision of lands which creates more than four (4) lots or is a major subdivision; and/or (b) multi-unit residential development incorporating more than four (4) individual units total, per site.

(*Id.*)

### F. Demographics of the Baton Rouge Metropolitan Statistical Area

The *Verified Complaint* also provides extensive allegations about the Town's demographics in support of Plaintiff's disparate impact claim. While this is not essential to the instant ruling, the Court summarizes those allegations as follows.

"The Parish, Town, and Property are located in the Baton Rouge Metropolitan Statistical Area (the 'BR MSA')." (*V. Compl.* ¶ 57, Doc. 1.) According to the *Verified Complaint*, the 2020 Census data provided that "870,569 people live in the BR MSA, with 476,248 white residents (54.7%) and 302,477 Black residents (34.7%)." (*Id.* ¶ 58.) Further:

> According to the American Community Survey ("ACS") performed by the U.S. Census Bureau, there are approximately 305,441 occupied housing units in the BR MSA of which 212,886 are "owner-occupied housing units" and 92,555 are "renter-occupied housing units." Only 24.5% of owner-occupied housing units are occupied by Black residents in the BR MSA. In contrast, 53.4% of renter-occupied housing units are occupied by Black residents.

(*Id.* ¶ 59.)

"According to the 2020 Census, 1,557 people live in the Town. Approximately 70% of the Town residents are white and 22% are Black. According to the 2020 Census data, the Black population fell by over 50% and the white population increased by 32%." (*Id.* ¶ 60.) Moreover:

> According to the ACS, there are approximately 746 occupied housing units in the Town of which 325 are owner-occupied. Approximately 86.2% of owner-occupied housing units are occupied by white residents, while only 13.8% of owner-occupied

housing units are occupied by Black residents. Zero owner-occupied housing units are occupied by Latino or Hispanic residents. Black residents occupy more than half of the renter-occupied housing units in the Town and 2.9% of such units are occupied by Latino or Hispanic residents.

(*Id.* ¶ 61.)  "Based on the number of units in a structure, Black, Hispanic, and Latino Town

residents are more likely to live in a structure with three or more units:"

| Race | Occupied Housing Units in Structure with More than Three Units[18] | Percentage of Total Occupied Units Based on Race |
|------|---------|---------|
| White[19] | 87 | 18% |
| Black[20] | 163 | 64% |
| Hispanic or Latino[21] | 12 | 100% |

(*Id.* ¶ 62.)

### G.  Claims for Relief, Prayer, and the Instant Motions

Plaintiff asserts two counts in the *Verified Complaint*. Count I is a claim under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* (*V. Compl.* ¶¶ 63–83, Doc. 1.)  Plaintiff makes claims of disparate impact, (*id.* ¶¶ 68–75), and discriminatory intent, (*id.* ¶¶ 76–83.)  Discovery seeks to "enjoin the enforcement of Ordinance 2022-1." (*Id.* ¶ 85.)  Moreover, given the July 2022 proposed changes to the CZO, Discovery also asks for a preliminary injunction prohibiting further changes to the CZO without Court approval. (*Id.*)  "Discovery further requests a preliminary and permanent injunction to enjoin the Town from interfering with its plans to develop its Property for the purpose of constructing the Development." (*Id.* ¶ 86.)  In addition, "Discovery . . . requests that this Court order the Town and Mayor to issue all permits necessary for the construction of the Development and provide all information requested by the U.S. Department of Housing and Urban Development so that Discovery can apply for financing available pursuant to federal law." (*Id.* ¶ 87.)  Lastly,

Plaintiff seeks damages for Defendant's "interference with its plans to construct the Development," as well as costs and attorney's fees. (*Id.* ¶¶ 88–89.)

Count II is an alternative claim for an unconstitutional taking. (*Id.* ¶¶ 90–96.) That claim is not at issue here. (*See* Doc. 25.)

Plaintiff prays for a "temporary restraining order enjoining the enforcement of Ordinance 2022-1 and the enactment of any further modifications to the CZO without this Court's approval." (*V. Compl.*, Doc. 1 at 22.) Discovery also prays for a preliminary and permanent injunction seeking the same relief. (*Id.*) Additionally, Plaintiff asks for "[a]n order commanding the Defendants to cooperate with Discovery, issue any and all necessary permits for the Development, and to provide any and all information requested by HUD for the financing of the construction of the Development[.]" (*Id.*)

On August 30, 2022, Plaintiff filed the instant *Motion for TRO* asking for "immediate temporary restraining order restraining, enjoining, and prohibiting Defendants from engaging in further illegal and improper conduct, including prohibiting Defendants from (1) enforcing Ordinance 2022-1 and (2) enacting any new changes to the CZO without prior approval from the Court." (Doc. 3 at 1.) In response, Defendants filed, inter alia, the instant *FHA MTD*, seeking dismissal on a host of grounds. (Doc. 18.)

### III.   FHA MTD

#### A. Rule 12(b)(1) Standard

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. Pursuant to Rule 12(b)(1), a claim " 'is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to

adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Moreover, when a complaint could be dismissed for both lack of jurisdiction and failure to state a claim, 'the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6).' " *Crenshaw-Logal v. City of Abilene*, 436 F. App'x 306, 308 (5th Cir. 2011) (quoting *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). "This practice prevents courts from issuing advisory opinions." *Id.* at 308 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate General of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. June 12, 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523. Whereas, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the

pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

## B.  Parties Arguments

### 1. Summary

Defendants employ a shotgun approach, arguing that Plaintiff's FHA claim fails for the following bevy of reasons: (1) Plaintiff fails to establish standing with respect to (a) the zone of interest, (b) injury-in-fact, (c) causation and traceability, and (d) redressability; (2) Plaintiff's claims are alternatively (a) unripe or (b) moot; and (3) the Court should apply the abstention doctrine of *Colorado River v. United States*, 424 U.S. 800 (1976).

A detailed analysis of each of these theories is not necessary.  In short, the Court finds that Plaintiff's FHA claim lacks standing with respect to traceability and redressability and that, further, this claim is not ripe for adjudication.

The Court lumps the discussion of these issues together because the Court's ruling rests on the same underlying fact: Discovery cannot proceed with the Development until the Third Sewage Capacity Ordinance expires.  Because of that ordinance, Plaintiff's alleged harm cannot be traced to the challenged ordinance, and Discovery's harm cannot be redressed until that ordinance lapses.

Further, any claim cannot be adjudicated until further factual development happens with that ordinance.

### 2. Defendants' Position on Traceability, Redressability, and Ripeness

Defendants assert that Discovery fails to satisfy the final two requirements for standing. (Doc. 18-1 at 16–17.)  Discovery's argument, according to Defendants, is that the 2022 Changes to the CZO will interfere with its ability to construct luxury residential units on a portion of the Property zoned as CH (Commercial Highway) because of a change to non-cumulative zoning, and then that this decrease in the number of luxury apartments will adversely affect future "renters" who may be minorities. (*Id.*)  But any attempt by Discovery to "attempt to trace the alleged injury to a protected group under the FHA is nothing but speculation." (*Id.* at 17.)

As to redressability, Discovery's claim also fails. (*Id.*)  Discovery attacks the 2022 Changes to the CZO, but "Discovery seeks considerably broader relief that seeks to upend *other* ordinances" which are not at issue and which are not alleged to have violated the FHA. (*Id.*)

> Thus, redressability cannot be established where, as here, the relief seeking to enjoin the 2022 Changes will not redress any alleged injury given the existing Sewer Capacity Ordinance and the failure of Discovery to obtain approval of its development as a result of the density requirements under the prior and unchallenged CZO.

(*Id.*)

Defendants also argue that this case is either moot or unripe.  (Doc. 18-1 at 18.)  Here, any "ruling on the 2022 Changes to the CZO will have no impact on Discovery's intention to move forward with its development as the development may not proceed as a result of the existing Sewer Capacity Ordinance and the density requirements under the prior CZO." (*Id.*)  The operative complaint contains no allegation that the Sewer Capacity Ordinance or prior CZO violated the FHA, so a ruling by the Court to the 2022 Changes will not allow the development to go forward.

(*Id.*)   Alternatively, here, the claim is not ripe because "Discovery's planned apartment development admittedly does not have financing, has never been approved given the density limitations under the CZO, does not have any permits and cannot obtain any permits as a result of the Sewer Capacity Ordinance[.]" (*Id.* at 19.)

### 3. Plaintiff's Position on These Issues

Plaintiff disputes Defendants' arguments on standing.  As to causation, Discovery asserts that its "injury is fairly traceable to Defendants' adoption of new zoning ordinances, which have a disparate impact on protected classes and was motivated by an intent to exclude members of protected classes." (Doc. 24 at 13.)  Concerning redressability, Plaintiff maintains, "if the relief Discovery seeks is granted, which includes, *inter alia*, restraining the enforcement of Ordinance 2022-1, the Development will no longer be nonconforming under the CZO (2015)." (*Id.* at 14.) Further, "[a] decision in Discovery's favor would remedy its economic injury, establishing the last prong of constitutional standing: redressability." (*Id.*)

Plaintiff does not directly address the ripeness argument; rather, they address the Sewer Capacity Ordinances indirectly in their reply brief. (*See* Doc. 23 at 3.)  Specifically, Discovery maintains that it has shown a substantial likelihood of success on the merits because there are less discriminatory alternatives to the Sewage Capacity Ordinances, such as (a) allowing Discovery to install its own sewer treatment system or (2) allowing Discovery to proceed with its project now rather than wait the two to three years for completion of the Town's new plant. (*Id.*)  Plaintiff continues later:

> The so-called Sewer Capacity Ordinance prevents development on a **temporary basis** until the sewer system could be expanded. The Town's current sewer capacity is, therefore, adequately protected by the Sewer Capacity Ordinance, and the Town's sewer capacity is not a substantial, legitimate, nondiscriminatory interest for enacting Ordinance 2022-1, which establish permanent changes and will

23

> predictably make housing unavailable to protected classes. Discovery predicted that the Defendants would cite the sewer capacity, which is why it alleged that "Ordinance 2022-1 serves no legitimate, substantial, nondiscriminatory interests of the Town." . . .
>
> First, and obviously, a temporary moratorium on development while the Town constructs its new sewer system will have less discriminatory impacts than the changes in 2022-1. The Town expects the sewer plant to be completed in 2-3 years. Second, the Town could require Discovery to construct its own sewer treatment facilities, which Discovery actually offered to do. Furthermore, it will take several years before Discovery needs to connect to the sewer system, so Defendants' argument is extremely weak regarding sewer capacity. Therefore, even if there was a legitimate interest, there are clearly less discriminatory options available to the Defendants to achieve those interests.

(*Id.* at 17–18.)

### C. Applicable Law

#### *1. Standing Generally and under the FHA in Particular*

"The standing doctrine is a threshold inquiry to adjudication, which defines and limits the role of the judiciary." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 570 F. Supp. 2d 851, 853 (E.D. La. 2008) (citing *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003) (citation omitted)). "It is well settled that unless a plaintiff has standing, a federal district court lacks subject matter jurisdiction to address the merits of the case." *Id.* "In the absence of standing, there is no 'case or controversy' between the plaintiff and defendant which serves as the basis for the exercise of judicial power under Article III of the constitution." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). "The key question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant federal court jurisdiction." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

24

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Id.* at 560–61 (cleaned up). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (citations and quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citation omitted).

Additionally, "Title VIII of the Civil Rights Act of 1968, more commonly known as The Fair Housing Act ('FHA'), broadly prohibits discrimination in housing on the basis of race, color, religion, sex, familial status, or national origin." *Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 499–500 (5th Cir. 2020) (citing 42 U.S.C. § 3601 et. seq.). "The FHA permits any 'aggrieved person' to bring a housing-discrimination lawsuit." *Id.* (citing 42 U.S.C.§ 3613(a)). "An 'aggrieved person' includes any person 'who claims to have been injured by a discriminatory housing practice' or believes that such an injury is 'about to occur.' " *Id.* (quoting 42 U.S.C. § 3602(i)). "Courts have interpreted this language to define standing under the FHA as 'broadly as is permitted by Article III of the Constitution.' " *Id.* (quoting *Trafficante v. Metro. Life Ins. Co*., 409 U.S. 205, 209 (1972)). "That means prudential limits on standing are not imposed, and third parties may bring claims on behalf of other persons." *Id.* (citing *Hanson v. Veterans Admin*., 800 F.2d 1381, 1384 (5th Cir. 1986)).

"The Supreme Court recently clarified, however, that even where (as here) Congress has abrogated prudential standing, a plaintiff may state a cause of action only when the interests in the litigation 'fall within the zone of interests protected by the law invoked.' " *Tenth St. Residential*, 968 F.3d at 499 (quoting *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (internal citations omitted)). The Court "must 'us[e] traditional tools of statutory interpretation' to determine 'whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.' " *Id.* (quoting *Bank of Am. Corp.,* 137 S. Ct. at 1303 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126-27)). "Thus, in addition to the Article III requirements, [Discovery's] claims must also meet the 'zone-of-interest' test." *id.*

### 2. Causation and Redressability

"Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.' " *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). "Causation, for example, isn't precluded where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Id.* (quoting *Bennett*, 520 U.S. at 169).  But a plaintiff's "injuries can't be the result of the independent action of some third party not before the court" or "self-inflicted." *Id.* (cleaned up).

"To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.' " *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (emphasis added)). "The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Id.* (quoting *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). *See also Dep't of*

*Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 432 (5th Cir. 2014) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." (citations omitted)).  "But relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Communities Project*, 946 F.3d at 655 (cleaned up).

### 3. Ripeness

Related to standing is ripeness, which is "a question of timing." *Donelon v. Altman*, No. 20-604, 2021 WL 4205654, at *3 (M.D. La. Sept. 15, 2021) (Dick, C.J.) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)). "To be justiciable, a case must be 'ripe,' meaning 'not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." ' " *Id.* (quoting *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998))).  "Ripeness ensures that federal courts do not decide disputes that are 'premature or speculative.' " *Id.* (quoting *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002) (citing *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000))). "A case becomes ripe when it 'would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.' " *Id.* (quoting *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010)).  "The ripeness inquiry reflects ' "Article III limitations on judicial power" as well as "prudential reasons for refusing to exercise jurisdiction." ' " *Id.* (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993))). "Ripeness is part of subject matter jurisdiction, which must be established by the party invoking federal

jurisdiction." *Id.* (citing *Abdelhak v. City of San Antonio*, No. 09-804, 2011 WL 13124298, at *10 (W.D. Tex. Dec. 6, 2011)).

"Ripeness, like mootness, is a justiciability doctrine, the basic rationale of which is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. For these reasons, a ripeness inquiry is often required when a party is seeking *pre-enforcement* review of a law or regulation." *Hoffman v. Jindal*, No. 12-796, 2022 WL 969050, at *5 n.57 (M.D. La. Mar. 30, 2022) (Dick, C.J.) (citing *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008)). "Mootness, on the other hand, occurs when a set of circumstances after the commencement of the lawsuit eliminates the actual controversy." *Id.* (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)). Since ripeness and mootness implicate subject matter jurisdiction, the Court is obligated to consider both, even *sua sponte. See id.* (citing *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 548 (5th Cir. 2020)).

### D.  Analysis

Having carefully considered the matter, the Court will grant the motion to dismiss. Again, Plaintiff's FHA claim fails for lack of standing and ripeness.

First, Plaintiff seeks to enjoin enforcement of the 2022 Changes to the CZO and prevent future changes. But Plaintiff's real injury was caused not so much by the 2022 Changes to the CZO but by the Moratorium which has been in effect in one form or another since July of 2020. (*See* Defs. Exs. C–G, Docs. 18-5–18-9.) Moreover, the problems with the Sewer System and Mississippi River flooding strike the Court as serious and legitimate, as demonstrated by the Town's sales tax, (Ordinance 2021-1, Defs. Ex. D, Doc. 18-6), and bond initiative (Ordinance 2022-4, Defs. Ex. F, Doc. 18-8). Phrased another way, for Plaintiff to have standing, "the injury has to be fairly . . . traceable to the challenged action of the defendant," *Lujan*, 504 U.S. at 560–

61, and here, Plaintiff's inability to proceed with the Development is traceable not so much to the "challenged action" (the 2022 Changes to the CZO) but to the Moratorium, which is not even at issue in this case.  Thus, Plaintiff fails to show causation.

Second, Discovery has failed to demonstrate redressability.  Again, even if Plaintiff obtained the relief sought (i.e., a Court order preventing the enforcement of the 2022 Changes), Discovery would still be unable to build the Development because of the Moratorium.  Plaintiff's proposed alternatives—either assuming without evidence that it could develop its own sewer system that comports with the Town's or proceeding with construction before the Town finishes its sewer work—are speculative and unreasonable.  Again, "relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court," *Inclusive Communities Project*, 946 F.3d at 655 (cleaned up), and such is the case here.

Finally, even if Plaintiff had standing, its FHA claim is not ripe for adjudication.  Defendants have represented (and Plaintiff does not dispute) that the sewer treatment plant will take another two to three years to complete.  At the very least, the Third Sewage Capacity Ordinance does not expire until June of 2023.  Without question, the Development depends on "future events that may not occur as anticipated, or indeed may not occur at all." *Donelon*, 2021 WL 4205654, at *3.  The case would clearly benefit from "further factual development"— including whether the Moratorium will be extended, as it has been since 2021; whether the sewage plant will be completed on time; and whether that plant will remedy the Town's sewage and flooding issues—all of which would put the Court in a better position to adjudicate the FHA claim. *Id.*  Plaintiff bore the burden on this issue, *id.*, and it has failed to carry it.

For all these reasons, the Court finds that it lacks subject matter jurisdiction over Plaintiff's FHA claim.  As a result, it will be dismissed without prejudice.

IV.     **Motion for TRO**

A.  **Standard for TROs Generally**

"[I]njunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) (citing *Allied Mktg. Group, Inc. v. C.D.L. Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)); *see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.") (citing 7 Moore's Federal Practice ¶ 65.04(s) (1982); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2942 at 368 (1973)).

"Injunctive relief is an extraordinary remedy, to be granted only if Plaintiffs clearly demonstrate (1) a substantial likelihood of success on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the Defendants, and (4) that granting the preliminary injunction will not disserve the public interest." *Gumns v. Edwards*, No. 20-231, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (Dick, C.J.) (citing *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted); *Justin Indus. v. Choctaw Sec., L.P.*, 920 F.2d 262 (5th Cir. 1990)). "Failure to establish any of these elements results in the denial of the motion for injunctive relief." *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 662 (S.D. Tex. 2020) (citing *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003)); *see also Hurley v. Gunnels*, 41 F.3d 662 (5th Cir. 1994) (unreported) ("failure to carry the burden on any one of the four elements will result in the denial of the motion") (citing *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471–72 (5th Cir. 1985) ("[t]he movant has a heavy burden of persuading the district court that all four elements are satisfied.

30

Thus, if the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue . . .")).

### B. Substantial Threat of Irreparable Injury

#### 1. Parties' Arguments

Plaintiff argues that, in the Fifth Circuit, if a statue allows the granting of injunctions, there is a presumption of irreparable harm. (Doc. 3-1 at 14.)  Here, the FHA allows such an injunction. (*Id.*)  Further, "discrimination in housing almost always results in irreparable injury," and Plaintiff relies on an Eastern District of Louisiana case in support of this position. (*Id.* at 14–15 (citing *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, No. 06-7185, 2011 WL 838899, at *2 (E.D. La. Mar. 4, 2011) (citing *United States v. Hayes*, 415 F.2d 1038, 1045 (5th Cir. 1969); *EEOC v Cosmair*, 821 F.2d 1085, 1090 (5th Cir. 1987))).)  Plaintiff continues, "In other words, the risk of discrimination and the perpetuation of segregation while a matter is pending supports a finding of irreparable harm. Ordinance 2022-1 will perpetuate segregation in the BR MSA and will establish artificial, arbitrary, and unnecessary barriers to protected classes seeking to move to the Town." (*Id.* at 14.)

Defendants argue that Plaintiff's plan for 155 apartment units failed to comply with the CZO even before the 2022 Changes. (Doc. 20 at 20–21.)  "Thus, it is not clear what impact, if any, changes to the CZO has actually had on the conceptual development and the allegations of irreparable harm are plainly speculative at this time." (*Id.* at 20.)  Moreover, Discovery asks for "monetary damages" for Defendants' interference with their ability to build the Development, so they fail to show irreparable harm. (*Id.*)

### 2. *Applicable Law*

"Irreparable harm requires a showing that: (1) the harm to Plaintiffs is imminent (2) the injury would be irreparable and (3) that Plaintiffs have no other adequate legal remedy." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 608 (N.D. Tex. 2006) (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983) (quoting *Deerfield Medical Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)). "[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co.*, 777 F.2d at 997 (citing *Carter v. Heard*, 593 F.2d 10, 12 (5th Cir. 1979)).

Further, "[t]he purpose of a temporary restraining order is to 'preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing, and no longer.' " *Gumns*, 2020 WL 2510248, at *3 (quoting *RW Dev., LLC v. Cuningham Grp. Architecture, Inc.*, 2012 WL 3258782, at *2 (S.D. Miss. Aug. 8, 2012)) (citing *Granny Goose Food, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974); *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). A party seeking a preliminary injunction, for example, does not suffer irreparable harm if "[t]here is nothing to suggest that harm suffered between the time of suit and the time of ultimate decision in this case would seriously prejudice [mover's] opportunity for full recovery" because, "in traditional terms of equity, the remedy at law is adequate." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009).

"The Fifth Circuit has held that when a statute authorizes the granting of injunctions, then the violation of the statute supports the presumption of irreparable injury." *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, No. 06-7185, 2011 WL 838899, at *2 (E.D. La. Mar.

4, 2011) (Berrigan, J.), *decision clarified*, No. 06-7185, 2011 WL 1671628 (E.D. La. Apr. 29,

2011) (citing *United States v. Hayes*, 415 F.2d 1038, 1045 (5th Cir. 1969); *EEOC v Cosmair*, 821

F.2d 1085, 1090 (5th Cir. 1987) ("When a civil rights statute is violated, 'irreparable injury should

be presumed from the very fact that the statute has been violated'"). "Here the Fair Housing Act

does permit the issuance of a temporary restraining order if a discriminatory housing practice has

occurred or is about to occur." *Id.* (citing 42 U.S.C. § 3613(c)(1)).  Judge Berrigan continued by

quoting at length from the Eleventh Circuit to explain "why discrimination in housing almost

always results in irreparable injury:"

> First, a person who is discriminated against in the search for housing
> cannot remain in limbo while a court resolves the matter. He or she
> must find housing elsewhere, and once that housing is found, even
> if in a segregated neighborhood, it becomes difficult to disrupt new
> friendships and other community ties by uprooting oneself again.
> Second, in a case such as this one, the available housing where the
> discrimination is occurring could become filled during the pendency
> of a lawsuit, making corrective relief nearly impossible to enter-
> clearly, a court lacks the authority to order innocent white tenants to
> vacate apartments to remedy discrimination against blacks or other
> minorities by the apartment management. Thus, preliminary
> injunctive relief may be necessary to insure that a remedy will be
> available. Third, monetary relief cannot correct the injury
> completely. In *Banks v. Perk* the court recited a litany of irreparable
> harm that occurs whenever housing discrimination occurs. That
> harm included, "the loss of safe, sanitary, decent and integrated
> housing; the loss of achieving integrated schools without the
> necessity of massive busing; the loss of housing which is accessible
> to jobs; and the loss of being unable to escape the never-ending and
> seemingly unbreakable cycle of poverty." 341 F. Supp. [1175, 1185
> (N.D. Ohio 1972)]. Additionally, as plaintiffs have asserted in this
> case housing discrimination causes irreparable injury by denying
> whites, as well as blacks, the benefits of living in an integrated
> community.

*Id.* (quoting *Gresham v. Windrush Partners, LTD,* 730 F.2d 1417, 1424 (11th Cir. 1984)).

But even the Eleventh Circuit recognized that a finding of a substantial likelihood of an FHA violation does not automatically mean that the irreparable harm requirement is satisfied. That circuit specifically stated:

> [W]e believe that when housing discrimination is shown it is reasonable to presume that irreparable injury flows from the discrimination. Appellants mistakenly argue that such a presumption does away with the requirement of irreparable injury. Nothing could be further from the truth. A presumption, as used in a case such as this, is merely an evidentiary technique used to apportion the burdens at trial and to maximize the efficiency of the judicial process. *Such a presumption, may, of course, be rebutted by evidence that any injury that may occur is not irreparable.* Thus, the real question in this case is whether the presumption of irreparable injury logically follows from a showing of a substantial likelihood that illegal discrimination has occurred.

*Gresham*, 730 F.2d at 1423–24 (emphasis added). The *Gresham* court affirmed the lower court's granting of injunctive relief because there was "no evidence in the record tending to rebut th[e] presumption" described above. *Id.* at 1424.

Further, the Eleventh Circuit's approach is not universal. For instance, in *Villages of Cornwallis Owners Association, Inc. v. Durham Housing Authority*, the district court found that its "case differ[ed] from *Gresham* on both legal and factual grounds." 894 F. Supp. 236, 239 (M.D.N.C. 1995). Relevant here, "under Fourth Circuit precedent, a court must examine irreparable injury before the merits are examined. In contrast, the standards discussed in *Gresham* do not appear to require the same sequential analysis dictated by [the Fourth Circuit]." *Id.* Second, and factually, the plaintiffs in *Villages of Cornwallis* filed suit "seeking an order enjoining the Durham Housing Authority and HUD from developing a low-income housing project on a particular site in Durham." *Id.* at 237. Thus, "[p]laintiffs fear[ed] a diminution in their property values and decreased safety. They have housing and would suffer no harm from the project until it is completed." *Id.* at 239. This was different than the plaintiff in *Gresham*, who was "a black

female attempting to locate subsidized housing," who "was turned away from an apartment complex due to her race," and who "was concerned that she would not be able to locate subsidized housing in an integrated area." *Id.*

Likewise, in *Arizona Recovery Housing Association v. Arizona Department of Health Services*, the district court also found that *Gresham* did not mandate a presumption of imminent irreparable injury in all FHA cases. 462 F. Supp. 3d 990, 998–1000 (D. Ariz. 2020). The *Arizona Recovery* court relied on *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), which held that the traditional four-factor test for injunctions applies in Patent Act cases (1) because "[l]ike the Patent Act, the Copyright Act provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement of a copyright[,]' " and (2) because "[u]nder that permissive language, the Court had 'consistently rejected invitations to replace the traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.' " *Arizona Recovery*, 462 F. Supp. 3d at 998–999 (quoting *eBay Inc.*, 547 at 393–94). *Arizona Recovery* also relied on *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011), which reached the same result in Copyright Act cases "because such 'permissive language does not evince a congressional intent to depart from traditional equitable principles.' " *Arizona Recovery*, 462 F. Supp. 3d at 998–99 (quoting *Perfect 10*, 653 F.3d at 980). The *Arizona Recovery* court then explained:

> The FHA's injunction-authorizing provision uses this same permissive language:
>
> > In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court ... *may grant as relief, as the court deems appropriate*, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such

> practice or ordering such affirmative action as may
> be appropriate).

> 42 U.S.C. § 3613(c)(1) (emphasis added). This permissive language
> does not indicate Congress intended a major departure from the long
> tradition of equity practice. The text does not establish a different
> standard for obtaining injunctive relief that excludes proof of
> irreparable harm as one of its elements. As *eBay* and *Perfect
> 10* recognized with regard to the Patent and Copyright Acts, the
> provision simply says that a court may grant an injunction on a
> showing that a violation has or is about to occur, a standard that is
> perfectly consistent with the traditional test for equitable relief.

*Id.* at 999.  The *Arizona Recovery* court also distinguished *Gresham*, explaining:

> The Court agrees with *Gresham* that all these things [(i.e. "the
> injuries that flow from discriminatory housing deprivations")] are
> true when someone is denied housing, or faces an imminent and
> likely threat of denial, simply because he or she is a member of a
> class that the FHA protects. Where the Court parts ways with
> *Gresham*, however, is that it does not believe all these harms are
> automatically present whenever a plaintiff can point to a law that
> may end up violating the FHA. Any injury at that point may still be
> theoretical, so far off that it is uncertain whether it will even occur.

*Id.* at 1000.

Thus, in *Arizona Recovery*, plaintiff sought a TRO to "halt [the Arizona Department of

Health Services'] efforts to collect [certain] fees from the [sober living] homes it [had] certifie[d],"

*id.* at 996, and the court found that "any injury [wa]s neither imminent nor certain to occur because

the administrative process for enforcing the statutes and rules now challenged has only just begun,"

*id.* at 1000.  Under the laws in question, "even on the initial denial of a license application, any

final decision—and any action to collect civil penalties as a result—[wa]s not imminent and

certainly [would] not occur before the Court [could] hold a preliminary injunction hearing." *Id.*

### 3. Analysis

Having carefully considered the matter, the Court finds, even assuming Discovery had

established jurisdiction, it has failed to establish *imminent* irreparable injury necessitating a

temporary restraining order.  Putting aside Defendants' representation that the sewer treatment plant will not be operational for another two to three years (which does not seem to be disputed by Plaintiff in briefing), as explained above, the Third Sewer Capacity Ordinance remains in effect until at least June 2023.  That town law has not been challenged in this case.  Thus, even if the Court were to suspend the 2022 Changes to the CZO and prevent future changes, Plaintiff could still not proceed with the Development for another nine months.  As a result, any alleged injury before the expiration of this ordinance is "speculative" and a mere "unfounded fear."  *Holland Am. Ins. Co.*, 777 F.2d at 997.[3]

The Court is highly cognizant of the evils that the FHA is meant to remedy, all of which were eloquently described by Judge Berrigan and the Eleventh Circuit.  But even those courts acknowledge that the irreparable injury is merely *presumed* to occur with civil rights violations.

Here, the unique facts of this case rebut that presumption; none of the harms identified by *Gresham*—leaving people in search of housing in limbo; the possibility of available housing being filled in the interim; "the loss of safe, sanitary, decent and integrated housing; the loss of achieving integrated schools without the necessity of massive busing; the loss of housing which is accessible to jobs; and the loss of being unable to escape the never-ending and seemingly unbreakable cycle of poverty;" and the denying all races the "benefits of living in an integrated community," *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 2011 WL 838899, at *2 (quoting *Gresham,* 730 F.2d at 1424)—can even begin to be remedied until the Town resolves its sewer issues and the Third Sewer Capacity Ordinance has lapsed. That is to say, even if Plaintiff had demonstrated a substantial likelihood of an FHA violation, any such irreparable injury caused by

---

[3] Further, considering the fact that the sewer ordinance has already been renewed twice, it is not unreasonable to assume that it could be renewed a third time.  Nevertheless, the Court does not base its ruling on this possibility.

that violation is not imminent and remains, at this point, speculative. *See Arizona Recovery*, 462 F. Supp. 2d at 999–1000.

The Court must emphasize the general rule that "[t]he purpose of a temporary restraining order is to 'preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing, and no longer.' " *Gumns*, 2020 WL 2510248, at *3 (quoting *RW Dev., LLC v. Cuningham Grp. Architecture, Inc.*, 2012 WL 3258782, at *2 (citing *Granny Goose Food*, 415 U.S. at 439; *Callaway*, 489 F.2d at 573)). In the Fifth Circuit, again, there is no irreparable harm if "[t]here is nothing to suggest that harm suffered between the time of suit and the time of ultimate decision in this case would seriously prejudice [mover's] opportunity for full recovery" because, "in traditional terms of equity, the remedy at law is adequate." *Bluefield Water*, 577 F.3d at 253. Here, there's no reason why Discovery will be "seriously prejudiced" by the CZO remaining in place at this time until a full trial can occur, particularly when Discovery must wait until, at the very least, the Third Sewer Capacity Ordinance expires to proceed with the Development.

In sum, even if the case were ripe and even if Plaintiff had standing, Discovery has failed to clearly show a substantial threat of imminent irreparable injury absent the granting of the extraordinary relief of a temporary restraining order. On this ground alone, Plaintiff's *Motion for TRO* could be denied. *See Hurley*, 41 F.3d 662 ("As Hurley has failed to satisfy the 'irreparable injury' element, the district court did not abuse its discretion in concluding that an injunction was not warranted. Consequently, this Court need not discuss whether he has proven the other three elements." (citing *Enterprise Intern.*, 762 F.2d at 472)).

## V.   CONCLUSION

In closing, the Court again emphasizes that the allegations in this case are serious.  The Court has not ruled that one side is right and the other wrong.  Indeed, at this point, the Court

cannot do so.  Rather, the Court is simply holding that Discovery is jurisdictionally barred from bringing its FHA claim at this time.  Whether it can prevail in the future on that issue is a question for another day.[4]

Accordingly,

**IT IS ORDERED** that the *Defendants' Motion to Dismiss Plaintiff's Claim under the Fair Housing Act for Lack of Subject Matter Jurisdiction, Failure to State a Claim, and/or to Dismiss or Stay under Colorado River Abstention* (Doc. 18) filed by Defendants Town of St. Francisville and Robert "Bobee" Leake is **GRANTED IN PART** in that the Fair Housing Act claim brought by Plaintiff Discovery Real Estate and Development, LLC is **DISMISSED WITHOUT PREJUDICE** for lack of standing and ripeness.  In all other respects, the *FHA MTD* is **DENIED IN PART AS MOOT**.

**IT IS FURTHER ORDERED** that the *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* (Doc. 3) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>October 6, 2022</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[4] And if or when that day comes, the Court hopes that the parties will make a better effort to conserve judicial time and resources.  Many of the briefs filed in this case were duplicate, with large chunks cut and pasted from other documents, and with duplicative arguments being made several times within the same filling.  The Court believes this case is being tried by impressive, seasoned lawyers, and the Court asks such able counsel to do what they can to promote judicial economy and curtail the unnecessary expending of court resources, particularly when the Court is on an expedited schedule brought by an emergency motion.